IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:24-CR-105-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| MATTHEW HILTON, | ) | |
| | ) | |
| Defendant. | ) | |

On December 10, 2024, a federal grand jury in the Eastern District of North Carolina charged Matthew Hilton ("Hilton" or "defendant") and a codefendant, Curtis Davis, with various drug and gun offenses [D.E. 1]. On October 3, 2025, Hilton moved to suppress evidence and for a hearing under Franks v. Delaware, 438 U.S. 154 (1978) [D.E. 64]. On November 18, 2025, the United States responded in opposition [D.E. 73]. On November 25, 2025, Hilton replied [D.E. 74]. On January 28, 2026, the court held a hearing concerning Hilton's motion to suppress [D.E. 90]. As explained below, the court enters these findings of fact and conclusions of law and denies Hilton's motion to suppress.

I.

In May 2023, investigators with the North Carolina State Bureau of Investigation ("SBI"), Lenoir County Sheriff's Office ("LCSO"), and Kinston Police Department ("KPD") developed a confidential source in an investigation of Hilton's drug trafficking. See [D.E. 64-2] 2; [D.E. 73-1] 2. On May 10, 2023, SBI Special Agent Charles Champion ("SA Champion") participated in an in-person interview of the confidential source. See [D.E. 73-1] 2. During the interview, the confidential source told SA Champion that the confidential source communicated with Hilton using a phone number (252) 933-2139 and said that the confidential source used that number many

times over several months to purchase drugs from Hilton. The confidential source also showed SA Champion the confidential source's phone contact information for Hilton with that phone number. See id.

A typewritten summary of SA Champion's notes from the May 10, 2023 interview with the confidential source described the confidential source's background, drug use, and interactions with Hilton (using Hilton's nickname, "Whiteboy"). See [D.E. 74-1] 1–4. The typewritten summary of SA Champion's notes do not include Hilton's phone number. See id. At the hearing, SA Champion testified credibly that, during the interview, the confidential source showed SA Champion Hilton's (252) 933-2139 phone number on the confidential source's cell phone.

After the interview but before May 12, 2023, SA Champion spoke with the confidential source about purchasing an ounce of methamphetamine from Hilton. See [D.E. 73-1] 2–3. The confidential source told SA Champion that the confidential source "made contact with Hilton at (252) 933-2139," and that Hilton told the confidential source "to come and get it." Id. The confidential source told SA Champion that the confidential source "would meet Hilton at 1116 Macon Street, Kinston North Carolina," a location where the confidential source had purchased methamphetamine from Hilton. Id. Hilton communicated with the confidential source outside law enforcement's presence. See id.[1] SA Champion arranged for the confidential source to conduct a controlled purchase of methamphetamine from Hilton on May 12, 2023. See id.

On May 12, 2023, agents of the SBI, the KPD, the LCSO, the Greene County Sheriff's Office, the Ahoskie Police Department, and the United States National Guard Counterdrug Unit

---

[1] SA Champion states in his 2025 affidavit that it is "typical in narcotics investigations" for a confidential source and target to arrange a controlled purchase outside the presence of law enforcement because the confidential source's interaction with the target "typically occurs whenever the [confidential source] can make contact with the intended dealer." Id. at 3. SA Champion credibly testified to the same at the hearing.

2

participated in a controlled purchase of methamphetamine from Hilton using the confidential source. See [D.E. 64-1] 1. SA Champion participated in surveillance during the controlled purchase. See id. at 2. The National Guard Counterdrug Unit provided aerial surveillance. See id. at 2–3. At 3:13 p.m., the confidential source called (252) 933-2139. See id. at 2. Law enforcement planned to record the phone call. See [D.E. 73-1] 3. No one answered. See [D.E. 64-1] 2. One minute later, a special agent searched the confidential source for weapons and contraband and found neither. See id. At 3:20 p.m., SA Champion provided $500 to the confidential source to use to purchase the methamphetamine from Hilton. See id. at 3. Before the confidential source and Detective Mizelle left the meeting place to conduct the controlled purchase, Lenoir County Sheriff's Detective Harrell activated "all audio and video surveillance equipment for the [undercover] vehicle." Id. at 3. During the controlled purchase, the confidential source recorded Hilton. See id. at 4. At 3:34 p.m., Detective Mizelle and the confidential source left to conduct the controlled purchase from Hilton at 1116 Macon Street. See id. at 3. At 3:56 p.m., investigators conducting aerial surveillance observed the confidential source out of the vehicle at 1116 Macon Street. See id. Detective Mizelle informed the other investigators about a vehicle at the residence with a North Carolina license plate JEJ-8452. See id. Investigators searched a law enforcement database and learned that Hilton owned the vehicle. See id. At 3:57 p.m., investigators saw the confidential source meet Hilton. See id. At 4:00 p.m., the confidential source returned to the vehicle. See id. At 4:19 p.m., Detective Mizelle and the confidential source returned to the meeting location. See id. at 4. A detective seized the drugs Hilton sold the confidential source (which tested presumptively positive for crystal methamphetamine), and agents searched the confidential source for weapons and drugs. See id. The agents did not find weapons or drugs on the confidential source. See id.

3

Investigators surveilled Hilton as he left 1116 Macon Street, and Hilton traveled in a Lexus SUV to 2000 U.S. Highway 258 North, in Kinston, North Carolina. See id. at 3. Investigators saw a black female exit Hilton's Lexus SUV, enter the residence at 2000 U.S. Highway 258 North, return to the car, and "put a bag in the back seat of Hilton's Lexus SUV." Id. at 3–4

On May 16, 2023, SA Champion obtained an order from North Carolina Superior Court Judge William W. Bland authorizing the use of a pen register and trap and trace ("PRTT") device with geolocation data for the (252) 933-2139 phone based on the first controlled purchase. See [D.E. 64-2]; [D.E. 64-3]. SA Champion's affidavit for that order stated that

> On Friday, May 12, 2023, members of the North Carolina State Bureau of Investigation (NCSBI) along with the Lenoir County Sheriff's Office (LCSO) and the Kinston Police Department (KPD) utilized an LCSO Source of Information (SOI) to conduct a controlled purchase of Crystal Methamphetamine from target, Matthew Hilton. The LCSO SOI made contact with Hilton at cell phone number 252-933-2139, prior to the controlled purchase, to request one ounce of crystal methamphetamine from Hilton. The SOI advised Special Agent (C. N. Champion) that 252-933-2139 is the telephone number Hilton always utilizes to sell narcotics to people in the Kinston area. Hilton answered on that telephone and told the SOI to come over and get it.

[D.E. 64-2] 2. SA Champion's affidavit described the May 12, 2023 controlled purchase, including the methamphetamine the confidential source purchased and that law enforcement tested. See id. SA Champion also wrote that the confidential source told SA Champion that the confidential source contacted Hilton at (252) 933-2139 "multiple times" in the past several months to conduct drug transactions. Id. Judge Bland authorized the PRTT device for 30 days. See [D.E. 64-3] 6.

After May 12, 2023, but before May 25, 2023, SA Champion communicated with the confidential source and told the confidential source "to try to arrange a controlled purchase from Hilton for two ounces of methamphetamine." [D.E. 73-1] 5. The confidential source told SA Champion that the confidential source "made contact with Hilton" at (252) 933-2139 and that

4

Hilton told the confidential source to meet Hilton at the "spot." Id. SA Champion arranged another controlled purchase of methamphetamine from Hilton using the confidential source. See id.

On May 25, 2023, agents of the SBI, the KPD, the LCSO, and the Ahoskie Police Department conducted a second controlled purchase of methamphetamine from Hilton using the confidential source. See [D.E. 64-4] 1–4. The second controlled purchase mirrored the first: investigators searched the confidential source for contraband and found none; Detective Mizelle drove the confidential source from a meeting place to 1116 Macon Street; the confidential source met with Hilton and purchased methamphetamine from Hilton while wearing an audio and visual recording device; and Detective Mizelle returned the confidential source to the meeting place. See id. at 2–4. During the second controlled purchase, the confidential source attempted several calls to Hilton at (252) 933-2139, but Hilton did not answer. See id. at 2. The confidential source told investigators that Hilton "often doesn't discuss drug business with his customer's [sic] over the phone." Id. Investigators identified two vehicles at 1116 Macon Street, a GMC Yukon and a Ford Expedition. See id. at 3. Investigators identified the driver of the GMC Yukon as Kayola Kornegay, Hilton's girlfriend. See id. During the controlled purchase, the confidential source provided some of the buy money to Hilton and the rest to Mike Fisher, aka "Mike Mike." See [D.E. 73-1] 6; [D.E. 64-12] 4. After the controlled purchase, investigators seized four plastic baggies of crystal methamphetamine the confidential source purchased from Hilton and searched the confidential source for other contraband. See [D.E. 64-4] 3. They found none. See id. at 4.

After May 25, 2023, but before June 7, 2023, SA Champion contacted the confidential source and instructed the confidential source "to make contact with Hilton in order to purchase four ounces of methamphetamine." [D.E. 73-1] 6. The confidential source told SA Champion that the confidential source communicated with Hilton at the (252) 933-2139 number and that Hilton

told the confidential source to meet Hilton at the "spot." Id. SA Champion arranged another controlled purchase from Hilton using the confidential source. See id.

On June 7, 2023, investigators conducted a third controlled purchase of methamphetamine using the confidential source. See [D.E. 64-5] 3. On that day, the confidential source called (252) 933-2139, but no one answered. See [D.E. 73-1] 7. Later, while SA Champion counted "buy money" in preparation for the controlled purchase, the confidential source told SA Champion that Hilton called the confidential source back and agreed to the deal. See id. The third controlled purchase mirrored the first and second controlled purchases, with an undercover officer driving the confidential source from a meeting place to 1116 Macon Street. See id. When the confidential source first met with Hilton, Hilton provided the confidential source with a partial quantity of the methamphetamine and told the confidential source to await his return with the rest of the methamphetamine at a gas station. See id. Investigators used cameras throughout Kinston to monitor Hilton's movements as he left to obtain the remaining methamphetamine. See id. at 7–8. The cameras showed that Hilton drove to a residence at 1111 East Shine Street in Kinston before returning to 1116 Macon Street with the rest of the methamphetamine. See id. at 8.[2] When Hilton returned, the confidential source returned to 1116 Macon Street from the gas station and completed the controlled purchase. See id. The confidential source purchased 117 grams of crystal methamphetamine from Hilton, which investigators recovered after the controlled purchase. See [D.E. 64-5] 3.

On June 13, 2023, SA Champion obtained an order from North Carolina Superior Court Judge Jeffrey B. Foster reauthorizing the PRTT device for the (252) 933-2139 phone based on the

---

[2] On July 6, 2023, investigators installed a pole camera outside 1111 East Shine Street. See id.

first, second, and third controlled purchases. See [D.E. 64-5]; [D.E. 64-6]. SA Champion's affidavit described the planning and execution of the first, second, and third controlled purchases, and the confidential source's communications with the (252) 933-2139 number to arrange the controlled purchases. See [D.E. 64-5] 2–4.

On June 26, 2023, Goldsboro Police Detective Cato (also an ATF Task Force Officer) applied for an order from Judge Bland authorizing a mobile tracking device on the Lexus SUV with North Carolina license plate JEJ-8453. See [D.E. 64-7] 1–3; [D.E. 64-14] 6. Detective Cato's affidavit contained the same description of the three controlled purchases that SA Champion used in the June 13, 2023 affidavit and application for the PRTT device on the (252) 933-2139 phone. Compare [D.E. 64-7] 1–3, with [D.E. 64-5] 2–4. Judge Bland issued the order. See [D.E. 64-8].

On July 6, 2023, investigators conducted a fourth controlled purchase from Hilton at 1116 Macon Street using the confidential source. See [D.E. 64-9] 1–5. Before the controlled purchase, investigators surveilled Hilton as he traveled from 1111 East Shine Street to 1116 Macon Street. See id. at 3. The controlled purchase mirrored the other three controlled purchases, with an undercover officer driving the confidential source to and from the controlled purchase. See id. Officers recovered 144 grams of crystal methamphetamine that the confidential source purchased from Hilton. See id at 4.

On July 11, 2023, SA Champion obtained an order from Judge Bland reauthorizing the PRTT device for the (252) 933-2139 phone based on the four controlled purchases. See [D.E. 64-10]; [D.E. 64-11]. The affidavit contained the same information concerning the earlier controlled purchases and adds information about the July 6 controlled purchase. See [D.E. 64-10] 2–5.

On that same day, SA Champion sought an order for a PRTT device for a phone number (984) 298-7766. See [D.E. 64-12]. In the affidavit, SA Champion described an April 25, 2023

7

controlled purchase of methamphetamine and crack that KPD made from Mike Fisher. See id. at 4–5. During the investigation into Fisher, Kinston police detectives learned that Hilton used another phone number, (984) 298-7766, to communicate with co-conspirators and other drug dealers. See id. at 5. Investigators subpoenaed toll records for (984) 298-7766, and learned that Hilton used the number to communicate with Fisher 79 times in a six-month period. See id. The toll records also showed that Hilton used the number 108 times in an approximately eight-month period to communicate with Robert Earl Williams, an individual from whom KPD conducted a controlled purchase of crack. See id. Investigators also learned that Hilton used (984) 298-7766 for his cash app account ($gangst76b). See id. SA Champion included this information in the affidavit. See id. SA Champion also described how Hilton "never discusses the actual weight or drug type over the phone" with the confidential source, and that Hilton "often times [] will not answer that telephone [(252) 933-2139]" if he is not at 1116 Macon Street. Id. at 2–3. SA Champion also included the information about the controlled purchases from Hilton. See id. at 2–4. Judge Bland authorized the PRTT device for the (984) 298-7766 phone. See [D.E. 64–13].

On July 16, 2023, investigators monitored Hilton as he flew from Raleigh, North Carolina, to Los Angeles, California, with a known drug associate. See [D.E. 64-14] 8. On July 19, 2023, Hilton returned to North Carolina. See id.

On July 21, 2023, investigators used the GPS monitor on Hilton's Lexus and observed Hilton's location as he traveled from Kinston to Wake Forest, stayed at a residence in Wake Forest for one minute, and then drove back towards Kinston. See id. at 8–9. Officers visually confirmed that Hilton was driving the Lexus. See id. at 9. Hilton then drove to the residence at 1111 East Shine Street. See id. Hilton's short stay in Wake Forest led investigators to believe that he traveled

to Wake Forest to obtain narcotics and then took the narcotics back to the "stash house" at 1111 East Shine Street in Kinston. See id.

On August 8, 2023, investigators searched the trash left on the curb outside 1111 East Shine Street. See id. at 10. Investigators saw Hilton place black trash bags into the trash bins at the residence. See id. Investigators recovered "large, heat-sealed bags with white powder residue in them, one of which field tested presumptive for cocaine, one of [which] was labeled 'Trebol' in black sharpie marker, along with a large quantity of ripped plastic sandwich bags, razor blades, digital scale boxes, and a large quantity of rubber gloves, all of which are used in the packaging and distribution of narcotics." Id. They also recovered mail addressed to Curtis Davis at 1111 East Shine Street and "a section of a cardboard shipping box with the address 1185 Duke Farm" Road in Wake Forest. See id.

On August 9, 2023, SA Champion applied for and obtained from Judge Foster reauthorization for the PRTT devices on the (252) 933-2139 and (984) 298-7766 phones, and the GPS tracker on Hilton's Lexus. See [D.E. 64-16] 1–12; [D.E. 64-17] 1–8; [D.E. 64-18] 1–12; [D.E. 64-19] 1–8; [D.E. 64-20] 1–5; [D.E. 64-21] 1–2. The affidavits contained the same investigation descriptions as the prior documents and added details about Hilton's movements, communications, and the trash pull. The affidavits also included details about an incoming call on the (984) 288-7766 phone which "deconflicted" with a phone number used in an SBI fentanyl investigation. See [D.E. 64-18] 6.

On September 7, 2023, SA Champion applied for and obtained reauthorization for the PRTT devices on both phones from North Carolina Superior Court Judge Henry L. Stevens IV. See [D.E. 64-22] 1–12; [D.E. 64-23] 1–8; [D.E. 64-24] 1–12; [D.E. 64-25] 1–8. In addition to the same details of the prior investigations, the applications and affidavits described that Hilton used

9

both phones to contact known drug dealers and traffickers, and that electronic surveillance repeatedly observed Hilton traveling from 1111 East Shine Street to the "trap house where he conduct[ed] the sales of illegal narcotics to his customers." E.g., [D.E. 64-22] 6.

On September 9, 2023, SA Champion monitored Hilton's location via the PRTT device on the (984) 298-7766 phone. See [D.E. 64-14] 11. SA Champion saw that Hilton left Kinston and traveled to 1185 Duke Farm Road in Wake Forest. See id. Hilton stayed at the residence "for a period of less than 15 minutes" before returning in the direction of Kinston. See id. SA Champion contacted the Wayne County Sheriff's Office and notified them that Hilton was driving south toward I-795 in Wayne County. See id. The GPS tracker showed Hilton's Lexis parked outside of Hilton's girlfriend's residence at 2000 Highway 258 North in Kinston. See id. at 12. Physical surveillance confirmed Hilton's Lexus at that residence. See id. SA Champion knew that Kayola Kornegay (Hilton's girlfriend) recently had purchased a BMW SUV and informed the Wayne County Sheriff's Office that Hilton could be driving the BMW SUV. See id. SA Champion observed the location of the (984) 298-7766 phone and notified the Wayne County Sheriff's Office of the phone's location in the Wayne County area. See id.

Wayne County Sheriff's Deputy Levi Clint Wise ("Deputy Wise") stopped Hilton on I-795 north of the Pikeville exit. Deputy Wise initiated the traffic stop based on an "extremely dark window tint" on the BMW. [D.E. 64-26] 8. Deputy Wise testified that he could not see a driver silhouette through the tinted window. Footage from Deputy Wise's bodycam confirms that the tint was extremely dark. See [G.X. 3] 1:31–1:35. Deputy Wise asked Hilton to exit the vehicle and walk to Deputy Wise's patrol car. See id. at 3:05–3:11. Hilton complied and stood outside Deputy Wise's car as Deputy Wise ran a computer check on Hilton's license and registration. See id. at 3:11–7:46.

While Deputy Wise ran the computer check, Corporal Devon Eakes ("Corporal Eakes") was on the scene with a police canine, K-9 Tod. See [G.X. 4] 1:43–3:50. Corporal Eakes and K-9 Tod are certified in narcotics detection by K2 Solutions, the National Police Canine Association, and the International Police Work Dog Association. See [D.E. 74-15] 1–3. Corporal Eakes conducted a canine sniff test for the odor of narcotics, and K-9 Tod alerted to the presence of narcotics inside the BMW. See [G.X. 4] 3:55–5:29. Based on probable cause, Deputy Wise and Corporal Eakes searched the BMW and recovered marijuana and U.S. currency from a bag in the front passenger area. See id. at 7:43–8:40. From a box in the back seat, the officers recovered approximately six kilograms of crystal methamphetamine. See [G.X. 3] 8:44–19:00. The officers arrested Hilton. See id. at 10:08.

On September 10, 2023, SA Champion applied for and received from Judge Foster search warrants for 1111 East Shine Street and an apartment at 101 Park Avenue in Kinston. See [D.E. 64-14] 12. On September 11, 2023, officers simultaneously executed the search warrants. See id. at 12–13. The apartment at 101 Park Avenue was unoccupied. See id. at 13. From 1111 East Shine Street, the officers recovered 18 firearms (4 of which were stolen), 2.2 kilograms of fentanyl, 2.4 kilograms of cocaine, 1.9 kilograms of crystal methamphetamine, 2.8 kilograms of marijuana, and 650 grams of mushrooms. See id. Officers apprehended Curtis Davis at 1111 East Shine Street and arrested him. See id. On September 27, 2023, Detective Cato applied for and obtained a search warrant from Judge Bland for an iPhone belonging to Hilton. See [D.E. 64-15] 1–6.

## II.

Hilton asks the court to suppress the May 16 and ensuing PRTT devices and all fruits because: (1) SA Champion's notes from his May 10 interview with the confidential source did not contain Hilton's (252) 933-2139 number, while the May 16, 2023 PRTT device affidavit and

11

application tied that number to Hilton; (2) the SBI surveillance notes from the May 12, 2023 controlled purchase stated that Hilton did not answer a May 12 call from the confidential source, while SA Champion stated in the May 16, 2023 PRTT device affidavit and application that the confidential source scheduled the controlled purchase from Hilton using the (252) 933-2139 number; and (3) SA Champion stated in the June 13, 2023 PRTT device affidavit that the confidential source arranged the controlled purchase prior to May 25, 2023, while the SBI surveillance notes stated that the confidential source attempted to call Hilton several times on May 25, 2023.

Hilton asserts that "[i]t is not believable that the probable cause affidavits are truthful when they directly and repeatedly contradict the information contained in the contemporaneous surveillance notes." See [D.E. 64] 6–7. Hilton also asks the court to disregard SA Champion's 2025 affidavit because, according to Hilton, SA Champion's 2025 affidavit is self-serving, contradicts statements from the surveillance notes, and the government does not corroborate the information in SA Champion's affidavit. See [D.E. 74] 2–4. In reply and at the hearing, Hilton also challenged the confidential source's trustworthiness because of the source's prior interactions with law enforcement, including selling drugs on February 16, 2023, to an undercover agent and failing to return the purchase money from the February 16, 2023 sale on March 1, 2023, and a 2012 forfeiture of a nursing license. See id. at 4–5.

"A defendant is entitled to attack an otherwise facially valid search warrant affidavit under the narrow exception created in Franks v. Delaware." United States v. Sanders, 107 F.4th 234, 252 (4th Cir. 2024) (cleaned up). To invalidate a warrant after a Franks hearing, a defendant must demonstrate by a preponderance of the evidence "(1) that [the officer] made false or misleading statements in the [warrant] affidavit; (2) that the statements were made deliberately or with reckless

12

disregard for the truth; and (3) that the statements were material to a demonstration of probable cause such that, when they are set aside, the remaining content was insufficient to establish probable cause." Jackson v. Carin, 128 F.4th 525, 534 (4th Cir. 2025); see Franks, 438 U.S. at 155–56, 171–72; United States v. Glass, 160 F.4th 563, 568–69 (4th Cir. 2025); United States v. Pulley, 987 F.3d 370, 376–77 (4th Cir. 2021); United States v. Moody, 931 F.3d 366, 370–71 (4th Cir. 2019); United States v. White, 850 F.3d 667, 672–73 (4th Cir. 2019); United States v. Lull, 824 F.3d 109, 114–20 (4th Cir. 2016); Miller v. Prince George's Cnty., 475 F.3d 621, 627–28 (4th Cir. 2007), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); United States v. Colkley, 899 F.2d 297, 300–01 (4th Cir. 1990).

"[O]mission-based attacks to affidavits trigger an even higher evidentiary burden than challenges based on false disclosures." Glass, 160 F.4th at 569 (4th Cir. 2025) (quotations and citation omitted); see Moody, 931 F.3d at 374. The defendant must demonstrate by a preponderance of the evidence that (1) the affiant omitted the information with intent to mislead or with reckless disregard that the omitted material would mislead the judicial officer, and (2) the omitted information was material to the probable cause determination. See Glass, 160 F.4th at 569; Pulley, 987 F.3d at 376–77; United States v. Haas, 986 F.3d 467, 474–77 (4th Cir. 2021); United States v. Wharton, 840 F.3d 163, 168–70 (4th Cir. 2016); Lull, 824 F.3d at 114–20; United States v. Tate, 524 F.3d 449, 454–55 (4th Cir. 2008). "The omission must be designed to mislead or must be made in reckless disregard of whether it would mislead." Tate, 524 F.3d at 455 (cleaned up). "A showing that the officer acted negligently, or that the omission was merely an innocent mistake, is insufficient to warrant suppression." Lull, 824 F.3d at 115; see Pulley, 987 F.3d at 377 ("What the officer-affiant should have known does not matter if he did not in fact know."). "[R]eckless disregard in the Franks context requires a showing that the affiant personally

recognized the risk of making the affidavit misleading." Pulley, 987 F.3d at 377; see, e.g., Moretti v. Thorsdottir, 157 F.4th 352, 362 (4th Cir. 2025). For an omission to be material, its inclusion must defeat probable cause. See Glass, 160 F.4th at 569; Moretti, 157 F.4th at 362; Tate, 524 F.3d at 455.

In assessing warrants and affidavits in support of warrants, the Supreme Court and the Fourth Circuit have emphasized that "warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation" and "must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the opportunity nor judged as an entry in an essay contest." Moody, 931 F.3d at 372 (quotations omitted); see United States v. Harris, 403 U.S. 573, 579 (1971); United States v. Ventresca, 380 U.S. 102, 108 (1965); Moretti, 157 F.4th at 363; United States v. Clenney, 631 F.3d 658, 665 (4th Cir. 2011). "A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." Ventresca, 380 U.S. at 108. The court "must refrain from nitpicking warrant affidavits with clarity afforded only by hindsight and the absence of an urgent, ongoing criminal investigation." Glass, 160 F.4th at 568.

A.

Hilton challenges SA Champion's statement in the May 16, 2023 PRTT device affidavit and application that the confidential source told SA Champion that "252-933-2139 is the telephone number Hilton always utilizes to sell narcotics to people in the Kinston area." [D.E. 64-2] 2. As for falsity, Hilton fails to show that the challenged statement is "objectively false." Pulley, 987 F.3d at 379 (emphasis omitted); Moody, 931 F.3d at 370. Hilton's only evidence of falsity is that SA Champion's May 10 interview notes do not contain Hilton's (252) 933-2139 number. See [D.E.

14

73] 2–3. SA Champion's notes recount the details about developing the confidential source, see [D.E. 73-1], and SA Champion credibly testified that the confidential source showed him Hilton's number during the meeting and told him that Hilton used the number to sell narcotics. SA Champion also credibly testified that he did not include the phone number in his notes because the focus of the report was the confidential source's "historical" background. Thus, Hilton fails to show falsity or scienter by a preponderance of the evidence. See, e.g., Pulley, 987 F.3d at 379 ("[A] defendant must show both objective falsity and subjective intent of the affiant through concrete evidence."); White, 850 F.3d at 674.

## B.

Hilton next challenges the statement in the May 16, 2023 PRTT device affidavit and application that the confidential source arranged the purchase of methamphetamine from Hilton using the (252) 933-2139 number. Hilton argues that this statement is false because the May 12 surveillance notes state that Hilton did not answer when, on May 12, the confidential source called (252) 933-2139 in the presence of law enforcement. See [D.E. 74] 3.

SA Champion credibly testified that the communication between the confidential source and Hilton to arrange the controlled purchase occurred before the confidential source's May 12 phone call in the presence of law enforcement, because the confidential source told him that the confidential source communicated with Hilton to arrange the purchase. See [D.E. 73-1] 3. The May 12 PRTT affidavit stated the same. See [D.E. 64-2] 2 ("The [confidential source] made contact with Hilton at cell phone number 252-933-2139, prior to the controlled purchase, to request one ounce of Crystal Methamphetamine from Hilton.").

In opposition, Hilton argues that SA Champion's statement in the affidavit about contacting Hilton is misleading because it is preceded by the sentence, "On Friday, May 12, 2023, members

15

of the North Carolina State Bureau of Investigation (NCSBI) along with the Lenoir County Sheriff's Office (LCSO) and the Kinston Police Department (KPD) utilized an LCSO Source of Information (SOI) to conduct a controlled purchase of Crystal Methamphetamine from target, Matthew Hilton." Id. Hilton's argument ignores Fourth Circuit and Supreme Court precedent instructing courts to "refrain from nitpicking warrant affidavits with clarity afforded only by hindsight and the absence of an urgent, ongoing criminal investigation." Glass, 160 F.4th at 568; see Harris, 403 U.S. at 579 (rejecting lower court's interpretation of a warrant affidavit as a "hypertechnicality"); Ventresca, 380 U.S. at 108 (rejecting "[t]echnical requirements of elaborate specificity" in warrant affidavits). Here, Hilton fails to show falsity. Moreover, because the statement in the affidavit was not false, Hilton cannot show scienter. Thus, Hilton's challenge to this statement fails.

C.

Hilton also attacks SA Champion's omission of information about the confidential source's trustworthiness from the May 16, 2023 PRTT device affidavit and application. Hilton raised this argument for the first time in his reply brief. See [D.E. 74] 4–5. And Hilton raised the argument that the omission of this information was material for the first time during the court's January 28, 2026 hearing. In his reply brief, Hilton made only the (different) argument that SA "Champion either knew or should have known that this CI was untrustworthy based on the CI's lifelong drug addiction, surrender of nursing license in 2012, sale of crystal methamphetamine to an undercover detective in February 2023, and theft of $1,200 in law enforcement funds in March 2023, two months prior to the first alleged controlled purchase from Mr. Hilton." Id.

16

An argument raised briefly in reply and altered at a hearing is not properly before the court. See, e.g., United States v. Williams, 445 F.3d 724, 736 n.6 (4th Cir. 2006). Thus, Hilton forfeited the argument.

Alternatively, Hilton's argument fails on the merits. As for intent, Hilton failed to present evidence at the hearing that SA Champion omitted information in May 2023 or thereafter about the informant's credibility with intent to mislead or in reckless disregard that doing so would mislead the Superior Court Judge. See Glass, 160 F.4th at 569–70; Moretti, 157 F.4th at 362; Pulley, 987 F.3d at 377. The court finds that SA Champion did not omit the information about the informant's credibility with intent to mislead or in reckless disregard that doing so would mislead the Superior Court Judge. And the fact of an omission is insufficient to show scienter. See Colkley, 899 F.2d at 301; Lull, 824 F.3d at 117 n.2. Thus, Hilton's material omission argument fails.

In opposition, Hilton cites Lull, 824 F.3d 109, and argues that SA Champion's omission of information about the confidential source's credibility demonstrates his intent to mislead. But Lull is distinguishable and does not help Hilton. In Lull, an informant told investigators that he could purchase narcotics from the defendant at the defendant's house and arranged a controlled purchase at the defendant's house. See id. at 111–12. When the informant left the house after purchasing narcotics, an undercover officer "observed [the informant] behave almost as if he was trying to conceal something in his pockets, underwear." Id. at 112 (quotations omitted). Moreover, after the controlled purchase, the informant failed to return the full amount of the remaining money that investigators provided to the informant for the controlled purchase. See id. The informant's actions led investigators to terminate the informant as a confidential informant "immediately" and to arrest the informant for obtaining property under false pretenses. Id. Nonetheless, investigators sought a warrant to search the defendant's house "just half an hour after the officers had arrested

the informant," and the affiant for the warrant to search the defendant's house "failed to disclose the informant's theft and subsequent arrest to the state court magistrate." Id. at 113. At the Franks hearing in Lull, the affiant testified that "he deliberately chose not to include the information at issue because, given that the controlled buy was completed prior to the theft, he believed the theft had no bearing on the purchase of narcotics from defendant's house." Id. at 116 (quotations and citation omitted).

The Fourth Circuit reversed the district court's holding that the affiant did not intend to mislead the magistrate or act recklessly. See id. at 115–18. The Fourth Circuit found four factors "dispositive": the "decisiveness" with which the investigators acted after learning of the informant's misconduct, the affiant's "knowledge of the consequences of the informant's crime," the "temporal proximity" between the informant's misconduct and the "decision to omit information from the affidavit," and the "obvious impact of the informant's misconduct on any assessment of his reliability." Id. at 116.

In Haas, the Fourth Circuit analyzed Lull and affirmed the district court's denial of a Franks motion where these four factors were absent. See Haas, 986 F.3d at 475–77. The informant's misconduct in Haas, as in this case, "did not concern the investigation itself" and did not involve dishonesty to the affiant. Id. at 476. Likewise, the informant's misconduct in Haas, as in this case, did not lead the investigators to discharge and arrest the informant. See id. And in Haas, as in this case, investigators did not seek the first warrant until over a month after the informant's misconduct. Id. Accordingly, Haas controls and Lull does not.

Alternatively, including the information about the informant's behavior on February 16 and March 1, 2023, and the forfeiture of a nursing license in 2012 would not defeat probable cause. "Because probable cause deals with probabilities and depends on the totality of the circumstances,

18

it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." District of Columbia v. Wesby, 583 U.S. 48, 57 (2018) (cleaned up); see Maryland v. Pringle, 540 U.S. 366, 371–72 (2003); Illinois v. Gates, 462 U.S. 213, 241–46 (1983); United States v. Dickey-Bey, 393 F.3d 449, 454 (4th Cir. 2004). Probable cause exists "when, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Zelaya-Veliz, 94 F.4th 321, 334 (4th Cir. 2024) (cleaned up); see Ornelas v. United States, 517 U.S. 690, 696 (1996); Gates, 462 U.S. at 238; United States v. Briscoe, 101 F.4th 282, 294 (4th Cir. 2024); United States v. Blakeney, 949 F.3d 851, 859 (4th Cir. 2020). "Probable cause is not a high bar." Wesby, 583 U.S. at 57; see Moretti, 157 F.4th at 364 ("The probable cause bar is a low one . . . .").

Even if the affidavit detailed the confidential source's misconduct on February 16 and March 1, 2023 and the forfeiture of a nursing license in 2012, probable cause existed to conclude that evidence of trafficking crystal methamphetamine would be found in connection with the (252) 933-2139 cell phone. Specifically, SA Champion informed Judge Bland of the May 12, 2023 controlled purchase that police observed from Hilton and included that the confidential source was transported to and from the controlled purchase "by an undercover detective." [D.E. 64-2] 2. SA Champion also informed Judge Bland that the May 12, 2023 controlled purchase took place "in front of the residence." Id. And, tying the controlled purchase to the phone number, SA Champion stated that the confidential source "made contact with Hilton" at the (252) 933-2139 number. Id.[3]

---

[3] The court received in evidence phone records of the (252) 933-2193 number's communication with the confidential source's cell phone. See [G.X. 1] 1–2. The phone records do not contain evidence of what was said and purport only to reflect the approximate duration of phone calls. See id. Hilton argued that the records demonstrate that the call the confidential source claims took place did not take place.

The records do not so reflect. At best, the records are ambiguous. Moreover, accepting Hilton's argument at face value, this later-learned information is irrelevant because, under Franks,

With this information, probable cause would have existed even if the affidavit and application included information about the confidential source's misconduct on February 16 and March 1, 2023, and the forfeiture of a nursing license in 2012. See, e.g., Ornelas, 517 U.S. at 696; Gates, 462 U.S. at 238; Briscoe, 101 F.4th at 294; Zelaya-Veliz, 94 F.4th at 334; Blakeney, 949 F.3d at 859. Thus, Hilton's Franks challenge also fails because he has failed to demonstrate materiality.

### D.

Hilton also argues that the June 13, 2023 PRTT device affidavit and application contained a false statement because it stated that the confidential source communicated with Hilton to set up the May 25 controlled purchase. See [D.E. 74] 3–4. Hilton asserts that the May 25 surveillance notes contradict this statement because the surveillance notes stated that Hilton did not answer when the confidential source attempted to call him. See id.; [D.E. 64-4] 2. The surveillance notes state that the confidential source made these calls "to set up" the controlled purchase. Id. SA Champion's 2025 affidavit states that the confidential source communicated with Hilton before May 25, 2023, to arrange the May 25, 2023 controlled purchase. See [D.E. 73-1] 5.

The court credits SA Champion's 2025 affidavit and his testimony and finds that the statement in the June 13 PRTT device affidavit is not false. Although the notes say that the confidential source called Hilton "to set up" the controlled purchase and Hilton did not answer, this does not demonstrate that the statement in the June 13 PRTT device affidavit was false. [D.E. 64-4] 2. The June 13 PRTT device affidavit and application stated that the confidential source "made contact" with Hilton to arrange the controlled purchase "prior to the controlled purchase." [D.E. 64-5] 3. This statement comports with SA Champion's 2025 affidavit and testimony.

---

"truthful" does not mean that "every fact recited in the warrant affidavit is necessarily correct." Franks, 438 U.S. at 165. Instead, it means that "the information put forth is believed or appropriately accepted by the affiant as true." Id. Thus, Hilton's argument fails.

20

Likewise, because this statement was true, Hilton cannot make the necessary scienter showing. Thus, Hilton has not met his burden to demonstrate perjury or reckless disregard by a preponderance of the evidence. See Franks, 438 U.S. at 155–56, 171–72; Glass, 160 F.4th at 568–69; Moody, 931 F.3d at 370–71; White, 850 F.3d at 672–73. Glass, 160 F.4th 563, 568–69

At bottom, the court rejects Hilton's attempts to discredit SA Champion, his testimony, and the 2025 affidavit. First, the argument that the affidavit is self-serving is not a sufficient basis for discrediting it. Every affidavit of this sort is self-serving. Moreover, and as explained, the affidavit does not conflict with the surveillance notes from the controlled purchases. As for the alleged lack of corroboration, the 2025 affidavit itself is sworn testimony which does not need further corroboration. Furthermore, the court heard and watched SA Champion testify at the hearing and finds him to be an extremely credible witness. Thus, the court rejects Hilton's Franks challenge to the warrant affidavit and applications in this case.[4]

## III.

Hilton argues that Deputy Wise violated the Fourth Amendment by stopping Hilton based upon a suspected illegal window tint. See [D.E. 64] 7–9. Specifically, Hilton argues that Deputy Wise lacked (1) reasonable suspicion to stop Hilton, (2) justification for allegedly prolonging the stop for the canine sniff, and (3) probable cause to search Hilton's car. See id.; [D.E. 74] 5–6. The court rejects Hilton's arguments.

## A.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

---

[4] Because Hilton's Franks challenge fails, the court does not address Hilton's arguments about the exclusionary rule.

U.S. Const. amend. IV. Temporary detention of an individual during a traffic stop constitutes a seizure. See Kansas v. Glover, 589 U.S. 376, 380–81 (2020); Rodriguez v. United States, 575 U.S. 348, 354 (2015); United States v. Arvizu, 534 U.S. 266, 273 (2002); Whren v. United States, 517 U.S. 806, 809–10 (1996); United States v. Feliciana, 974 F.3d 519, 522 (4th Cir. 2020); United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017); United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015); United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011), abrogated on other grounds by Rodriguez, 575 U.S. 348. A traffic stop is "more akin to an investigative detention than a custodial arrest," and is reviewed under the standard established by Terry v. Ohio, 392 U.S. 1 (1968). United States v. Perez, 30 F.4th 369, 374–75 (4th Cir. 2022); see United States v. Perry, 92 F.4th 500, 509–10 (4th Cir. 2024); United States v. Williams, 808 F.3d 238, 245–46 (4th Cir. 2015). An officer may stop and briefly detain a person for investigative purposes when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Terry, 392 U.S. at 30; Illinois v. Wardlow, 528 U.S. 119, 123–24 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989).

Reasonable suspicion is a lower bar than probable cause. "Reasonable suspicion is a commonsense, nontechnical standard that relies on the judgment of experienced law enforcement officers, not legal technicians." Williams, 808 F.3d at 246 (cleaned up); see Ornelas, 517 U.S. at 695–96; United States v. Smart, 91 F.4th 214, 223 (4th Cir. 2024). Reasonable suspicion is "simply" a "particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas, 517 U.S. at 696 (cleaned up). Whether there is reasonable suspicion depends on the totality of the circumstances, including information known to the officer and any reasonable inferences to be drawn at the time of the stop. See Arvizu, 534 U.S. at 273; United States v. Foster, 824 F.3d 84, 89 (4th Cir. 2016). "This process allows officers to draw on their own experience

and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Arvizu, 534 U.S. at 273 (quotations and citation omitted); see United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). So long as "the circumstances, viewed objectively, justify [the officer's] action[s]," the officer's subjective motivation for the traffic stop is irrelevant. Whren, 517 U.S. at 813 (citation omitted); see Ohio v. Robinette, 519 U.S. 33, 38 (1996); Perry, 92 F.4th at 509–10; United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016); United States v. McDonald, 61 F.3d 248, 254 (4th Cir. 1995), overruled in part on other grounds by United States v. Wilson, 205 F.3d 720 (4th Cir. 2000); United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993).[5]

"Under Terry, a traffic stop is reasonable if (1) the stop is legitimate at its inception and (2) the officer's actions during the stop are reasonably related in scope to the basis for the stop." Perez, 30 F.4th at 375; see United States v. Bowman, 884 F.3d 200, 209–10 (4th Cir. 2018). The first prong of this test is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." Palmer, 820 F.3d at 649; Arizona v. Johnson, 555 U.S. 323, 330–31 (2009). "Without question, such a violation may include failure to comply with traffic laws." Palmer, 820 F.3d at 649; see United States v. Green, 740 F.3d 275, 279 n.1 (4th Cir. 2014) (noting that "ample support" existed for finding a traffic stop justified at inception where officer testified that he observed windshield tints which "appeared to violate Virginia law").

The second prong "restricts the range of permissible actions that a police officer may take after initiating a traffic stop." Palmer, 820 F.3d at 649. "[T]he tolerable duration of police

---

[5] Hilton also asserts that the stop was pretextual and Whren was wrongly decided. See [D.E. 64] 8. Whren is binding precedent. Thus, Hilton's argument fails.

inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez, 575 U.S. at 354 (cleaned up); see United States v. Jordan, 952 F.3d 160, 165–66 (4th Cir. 2020). Authority for the seizure "ends when tasks tied to the traffic infraction are" or "reasonably should have been" completed. Rodriguez, 575 U.S. at 354; see Perry, 92 F.4th at 510. Thus, a canine sniff test that does not "lengthen the roadside detention" is permissible. Rodriguez, 575 U.S. at 349; Illinois v. Caballes, 543 U.S. 405, 407–10 (2005); United States v. Joseph, 138 F.4th 797, 803–04 (4th Cir. 2025); Hill, 852 F.3d at 382. "If a traffic stop is extended in time beyond the period that the officers are completing tasks related to the traffic infractions, the officers must either obtain consent from the individuals detained or identify reasonable suspicion of criminal activity to support the extension of the stop." Hill, 852 F.3d at 381; see Smart, 91 F.4th at 223–25; Perez, 30 F.4th at 375; Bowman, 884 F.3d at 211.

Deputy Wise lawfully initiated the stop. North Carolina law mandates that the "total light transmission" of tinted windows must be "at least thirty-five percent." N.C. Gen. Stat. § 20-127(b)(1). Deputy Wise testified credibly that he stopped Hilton's car because he could not see a driver's silhouette through the window. Based on his training and experience, Deputy Wise believed that the tint violated North Carolina law. Furthermore, the court reviewed Deputy Wise's bodycam footage. Hilton's windows had an extremely dark tint. Cf. Scott v. Harris, 550 U.S. 372, 378–79 (2007). Deputy Wise also credibly testified that Deputy Wise measured Hilton's window tint as exceeding the North Carolina legal light transmission threshold. Deputy Wise's observation that Hilton drove a car with an extremely dark window tint justified initiating the stop. See, e.g., Palmer, 820 F.3d at 649; Green, 740 F.3d at 279 n.1.

In opposition, Hilton argues that Deputy Wise lacked reasonable suspicion because Deputy Wise did not confirm Hilton's car was registered in North Carolina before stopping him. North Carolina's window tint statute contains an exception for vehicles registered out-of-state, so Hilton argues that Deputy Wise's failure to eliminate this possibility meant that Deputy Wise could not initiate the traffic stop. See N.C. Gen. Stat. § 20-127(c)(10) (providing that a "window of a vehicle that is registered in another state and meets the requirements of the state in which it is registered" need not meet the statute's requirements).

Deputy Wise credibly testified that he believed that the temporary tag on the BMW was from North Carolina. Even if he was mistaken, Deputy Wise's failure to "rule out" the possibility that Hilton's car was registered in another state does not eliminate reasonable suspicion. Navarette v. California, 572 U.S. 393, 403 (2014) (citation omitted); see Glover, 589 U.S. at 381; Arvizu, 534 U.S. at 273. For example, in Glover, an officer stopped a vehicle because the vehicle's registered owner had a revoked license. See 589 U.S. at 379. The officer "assumed the registered owner of the truck was also the driver, [the defendant]." Id. The lower court held that the officer lacked reasonable suspicion to initiate the stop because the officer's assumption that the registered owner also drove the car was "only a hunch" that required "applying and stacking unstated assumptions that are unreasonable without further factual basis." Id. at 380 (citations omitted). The Supreme Court reversed and explained that reasonable suspicion justified the officer's stop because the officer "drew the commonsense inference that [the defendant] was likely the driver of the vehicle, which provided more than reasonable suspicion to initiate the stop." Id. at 381.

Glover defeats Hilton's argument. Like the officer in Glover, Deputy Wise relied on the commonsense inference that Hilton's car likely was registered in North Carolina, and his window

25

tint violated N.C. Gen. Stat. § 20-127(b)(1).[6] That Deputy Wise did not confirm this fact does not eliminate reasonable suspicion. As the Glover Court explained, "when the officer lacks information negating an inference" of the traffic violation, "the stop is reasonable." 589 U.S. at 378 (emphasis added). Thus, Deputy Wise's observation of an extremely dark window tint provided reasonable suspicion to initiate the stop and justified stopping Hilton. See Glover, 589 U.S. at 378–81; Navarette, 572 U.S. at 403; Arvizu, 534 U.S. at 273; Foster, 824 F.3d at 89–96; Palmer, 820 F.3d at 649; Green, 740 F.3d at 279

      Deputy Wise also did not unlawfully prolong the traffic stop. Deputy Wise promptly worked to end the encounter with Hilton and completed his computer check of Hilton's information in approximately eight minutes. Deputy Wise's bodycam shows him working through these tasks, and the court credits his testimony about his conduct during the stop. Moreover, Corporal Eakes and K-9 Tod conducted the sniff test "within the time reasonably required to issue a traffic citation" because the sniff test occurred as Deputy Wise diligently worked to complete the computer check. Green, 740 F.3d at 280 (citation omitted); see Caballes, 543 U.S. at 407–10; Joseph, 138 F.4th at 803–04; Perez, 30 F.4th at 376–77 (stop not unlawfully prolonged where officers investigated defendant's license, the car's expired and fictitious tags, and wrote multiple citations, during which time a canine sniff test occurred); Hill, 852 F.3d at 382 (stop not unlawfully prolonged where officers completed stop in 20 minutes, when estimated time to complete stop was

---

[6] Deputy Wise testified that that the stop occurred on Interstate I-795, about 45 minutes from Raleigh, North Carolina, in the direction of Kinston, North Carolina. The court finds that Deputy Wise's unstated assumption that a car with a temporary tag traveling southbound from Wake Forest, North Carolina, to Kinston, North Carolina, likely would be registered in North Carolina is commonsense. See Glover, 589 U.S. at 381 (describing as "commonsense" the inference that a car's registered owner is likely the car's driver).

26

18 minutes); United States v. Branch, 537 F.3d 328, 336–38 (4th Cir. 2008). Accordingly, Hilton fails to show that the stop was unjustified at inception or unlawfully prolonged.

## B.

Finally, Hilton argues that that the K-9 Tod's alert on Hilton's car did not provide probable cause to search the car. See [D.E. 64] 8–9; [D.E. 74] 5–6. Hilton argues, based on a newspaper article, that "despite Illinois v. Caballes, a K-9 sniff does not constitute probable cause for the presence of illegal controlled substances." [D.E. 64] at 9 (citation omitted). In reply, Hilton also suggests that Corporal Eakes's K-9, Tod, is unreliable. See [D.E. 74] 5–6. Hilton suggests that Tod could have been inaccurate about 54% of the time, assuming that every no alert during four years in the field was a false-negative alert. See id.[7]

The "touchstone" of the analysis "under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Pennsylvania v. Mimms, 434 U.S. 106, 108–09 (1977) (per curiam) (quotations and citation omitted). A search pursuant to a valid warrant is reasonable. The Fourth Amendment, however, "does not specify when a search warrant must be obtained." Kentucky v. King, 563 U.S. 452, 459 (2011). Although warrantless searches are "presumptively unreasonable," id. (citation omitted), courts have recognized "categories of permissible warrantless searches." Fernandez v. California, 571 U.S. 292, 298 (2014); see King, 563 U.S. at 459; Flippo v. West Virginia, 528 U.S. 11, 13–14 (1999) (per curiam); Mimms, 434 U.S. at 108–09; Katz v. United States, 389 U.S. 347, 357 & n.19 (1967) (collecting cases). The automobile exception occupies one of these categories. See Maryland v. Dyson, 527 U.S. 465, 466–67 (1999) (per curiam); United States v. Ross, 455

---

[7] Hilton arrives at 54% by adding Tod's known false positive alerts to every negative alert and divides that number (119) by the total number of sniff tests Tod performed. See [D.E. 74] 6.

U.S. 798, 809 (1982); Carroll v. United States, 267 U.S. 132, 149 (1925); United States v. Caldwell, 7 F.4th 191, 200 (4th Cir. 2021).

The automobile exception "allows police to conduct a warrantless search of a readily mobile vehicle if they have probable cause to do so." Caldwell, 7 F.4th at 200; see Dyson, 527 U.S. at 467. "When police have probable cause, the automobile exception [to the Fourth Amendment's warrant requirement] permits the search of every part of the vehicle that may conceal the object of the search." United States v. Alston, 941 F.3d 132, 138 (4th Cir. 2019) (cleaned up); see Ross, 456 U.S. at 825. "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." Florida v. Harris, 568 U.S. 238, 243 (2013) (cleaned up); see, e.g., Pringle, 540 U.S. at 371; Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality op.). "[A]n alert from a [reliable] drug sniffing dog gives probable cause to search a vehicle." United States v. Junkins, 860 F. App'x 297, 302 (4th Cir. 2021) (per curiam) (unpublished); see Harris, 568 U.S. at 250; Caballes, 543 U.S. at 408–09.

When a defendant challenges probable cause founded on a dog's alert, the court must decide "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Harris, 568 U.S. at 248; see Green, 740 F.3d at 282. In Harris, the Court stated that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert" and certification by a bona fide organization entitles a court to presume, "subject to any conflicting evidence offered," that the dog's alert provides probable cause to search. 568 U.S. at 246–47. The defendant may attack the adequacy of the certification or training program and examine the dog's and handler's performances in those

28

programs. See id. at 247. The Court also cautioned against undue reliance on field performance, which "may markedly overstate a dog's real false positives." Id. at 246; see id. at 245–46. "Records of a dog's field performance . . . in most cases . . . have relatively limited import." Id. at 245.

In Green, the Fourth Circuit applied Harris to a dog sniff of a car that occurred following a traffic stop for excessively tinted windows and an obscured license plate. See 740 F.3d at 277–79. The dog's field success rate (the number of times drugs were found after a positive alert) was 25.88% to 43%. See id. at 283. The defendant argued that the dog's inaccuracy negated probable cause founded on the dog's alert. See id. The Fourth Circuit rejected the defendant's argument. See id. at 283–84. The dog's field performance, the Fourth Circuit explained, was not dispositive because the government presented extensive, uncontroverted evidence of the dog's "reliable performance in training and certification programs." Id. at 283. Notably, the dog had a 100% success rate in controlled testing environments and had been recertified each year for four years. See id. Thus, the Fourth Circuit rejected the defendant's challenge to the dog's reliability. See id. at 284.

Here, as in Green, the government presented uncontroverted evidence that K-9 Tod and Corporal Eakes performed reliably in training and certification programs. See [D.E. 73-15] 1–3. Corporal Eakes credibly testified at the hearing, and the court credits his testimony. Specifically, Corporal Eakes testified that he and K-9 Tod have worked together since 2019 and possess certifications from various K-9 training agencies used by North Carolina law enforcement. Corporal Eakes also testified that he and K-9 Tod trained monthly on narcotics detection from 2019 to 2020. From 2019 to 2023, Corporal Eakes testified that he used K-9 Tod to detect the presence or absence of narcotics during roughly 278 traffic stops. Corporal Eakes credibly testified

29

that, throughout training and in the field, he had no "problems" with using K-9 Tod to detect narcotics. In the government's response brief, the government also represented that between December 2019 and September 8, 2023, "Eakes and K-9 [Tod] responded to 218 traffic stops [and] there were 99 positive alerts for the presence of the odor of narcotics, 97 no alerts, [and] 22 positive alerts that did not result in a seizure." [D.E. 73] 13.

In reply, Hilton attacks K-9 Tod's reliability because, based on figures from the government's response brief, K-9 Tod "is known to have falsely alerted more than 10% of the time." [D.E. 74] 5–6. And Hilton argues that "there is no way of knowing if K-9 Tod's non-alerts were accurate." Id. at 6. But "records of a dog's field performance . . . in most cases . . . have relatively limited import." Harris, 568 U.S. at 245. Even if the court accepted Hilton's inference that K-9 Tod gave inaccurate alerts 54.6% of the time, K-9 Tod's field success rate would be 46.4%—higher than the rate at issue in Green. See 740 F.3d at 283. Thus, the court rejects Hilton's argument about K-9 Tod's reliability and finds that K-9 Tod's alert provided probable cause to search Hilton's vehicle. See, e.g., Harris, 568 U.S. at 250; Caballes, 543 U.S. at 408–09; Junkins, 860 F. App'x at 302.

IV.

In sum, the court denies defendant's motion to suppress [D.E. 64].

SO ORDERED. This _12_ day of February, 2026.

J. Dever

JAMES C. DEVER III
United States District Judge

30